# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                                         |   |                                |
|-----------------------------------------|---|--------------------------------|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION, | ) )<br>) )<br>) ) |                                |
| Plaintiff,                              | ) )<br>) )  |                                |
| v.                                      | ) | Civil Action No. 12-1186 (ABJ) |
| HOWARD UNIVERSITY,                      | ) )<br>) )<br>) ) |                                |
| Defendant.                              | ) )<br>) ) |                                |

## MEMORANDUM OPINION

Plaintiff the Equal Employment Opportunity Commission ("EEOC") brings this action on behalf of Clarence Muse, alleging that defendant Howard University violated Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* (2012) ("ADA"), by declining to hire Muse based on his disability. At the time Muse applied to work for defendant, he was suffering from end-stage renal disease and was required to undergo dialysis treatments three times a week. Defendant has moved for summary judgment, contending that its failure to hire Muse was not unlawful because the schedule for Muse's dialysis treatment prevented him from being able to work a flexible three-shift schedule, which defendant claims was an "essential function" of the positions for which Muse applied. Def.'s Mot. for Summ. J. [Dkt. # 14] ("Def.'s Mot."); Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 14-1] ("Def.'s Mem."). Plaintiff opposed that motion. Pl.'s Mem. of P. & A. in Supp. of Pl.'s Opp. to Def.'s Mot. [Dkt. # 15-1] ("Pl.'s Opp."). The Court finds that defendant has offered varying descriptions of what the job entailed and that even if availability for a flexible shift schedule can be deemed to be "essential," there is a genuine issue of material fact in dispute

as to whether Muse could have performed that function. So, the Court will deny defendant's motion for summary judgment.

## BACKGROUND

The following facts are not in dispute except where noted. The Equal Employment Opportunity Commission is the United States agency charged with the enforcement and interpretation of the Americans with Disabilities Act. Compl. [Dkt. # 1] ¶ 3. Clarence Muse is a veteran of the District of Columbia Metropolitan Police Department with over forty years of law enforcement experience. Ex. 3 to Pl.'s Opp. [Dkt. # 15-1]. Muse was diagnosed with Type 2 diabetes in 1986, Dep. of Clarence L. Muse 232:17–19, May 14, 2013, Ex. 4 to Pl.'s Opp. [Dkt. # 15-4] ("Muse Dep."), which later progressed into end-stage renal disease. Dep. of Anthony D. Bivins, M.D. 42:16–44:6, July 26, 2013, Ex. 5 to Pl.'s Opp. [Dkt. # 15-5] ("Bivins Dep."). At the time Muse applied to work for defendant, he was required to receive dialysis treatment approximately three days a week in order to "sustain [his] existence." *Id.* 12:22–13:9; *see also* Muse Dep. 75:18–76:20. With the exception of a brief period in 2002, Muse's physician never placed him on any type of work restriction. Bivins Dep. 12:1–21.

In 2009, Muse applied for positions as a Protective Services Supervisor ("PSS") and Protective Services Officer ("PSO") with the unarmed security force of the Howard University Hospital. *See* Def.'s Statement of Material Facts not in Dispute [Dkt. # 14-2] ¶ 11 ("Def.'s SOF"); Pl.'s Resp. to Def.'s Statement of Material Facts not in Dispute [Dkt. # 15-2] ¶ 11 ("Pl.'s SOF Resp."). The written vacancy announcements for the PSS and PSO positions stated that it was a "minimum requirement" that an applicant "be able to work nights, weekends and holidays as well as rotating day and evening shifts as assigned." Ex. 1 to Def.'s Mot. [Dkt. # 14-3] at 2 (PSO position description); Ex. 2 to Def.'s Mot. [Dkt. # 14-4] at 3 (PSS position description).

There were three shifts for both jobs: 7:00 a.m. to 3:00 p.m.; 3:00 p.m. to 11:00 p.m.; and 11:00 p.m. to 7:00 a.m. Dep. of Marvin Cooper 144:10–12, May 29, 2013, Ex. 7 to Def.'s Mot. [Dkt # 14-9] ("Cooper Dep."). Defendant contends that being available to work all three of the shifts was an "essential function" of the PSO and PSS positions. Def.'s Mem. at 9–11.

On August 18, 2009, Muse interviewed for the two security positions. Def.'s SOF ¶ 11; Pl.'s SOF Resp. ¶ 11. Muse was interviewed by Marvin Cooper, who supervised the Department of Protective Services ("DPS") at the hospital, and Dr. Glenda Hodges, Cooper's supervisor and the Associate Director of Howard University Hospital at the time. Dep. of Glenda Hodges, Ph.D. 84:3–13, 85:7–17, July 22, 2013, Ex. 8 to Def.'s Mot. [Dkt. # 14-10] ("Hodges Dep."); *see also* Cooper Dep. 98:9–12. Hodges had final authority with respect to hiring decisions. Cooper Dep. 93:5–15.

At some point during the interview, Muse told Cooper and Hodges that he received dialysis treatments every Monday, Wednesday, and Friday before noon. Muse Dep. 230:20–231:8; Cooper Dep. 155:18–19, 156:4–8. It is not clear from the record, however, exactly how the information about Muse's dialysis schedule came to light. Cooper testified in his deposition that he reviewed the job descriptions with Muse during the interview, and then Muse informed him that he could only work two of the three shifts because of his dialysis schedule. Cooper Dep. 155:18–19, 156:4–8. Hodges testified that Muse's dialysis schedule came up in the context of Muse's requesting a "light duty" position because "subsequent to the [dialysis] treatment he was washed out."[1] Hodges Dep. 104:21, 105:15–19, Ex. 8 to Def.'s Mot. And Muse testified that he volunteered the information about his dialysis schedule in response to Cooper's inquiry

---

1     Neither party has included any testimony from Muse himself about whether or not he made a request for light duty, nor do they discuss this alleged request in their pleadings. But defendant's motion for summary judgment does not depend on the resolution of this issue.

3

about whether he would have any trouble getting to work on time, and that Hodges and Cooper then promptly ended the interview. Muse Dep. 140:11–19, 143:10–17.[2] Muse also indicated that he preferred an evening shift on the written job application, which invited candidates to state a shift preference. Ex. 10 to Pl.'s Opp. [Dkt. # 15-10].

Regardless of how the subject of Muse's dialysis arose, it is undisputed that neither Cooper nor Hodges responded to Muse's statement describing his dialysis schedule, or asked any follow-up questions. Muse Dep. 143:10–20; Hodges Dep. 105:20–22, Ex. 8 to Def.'s Mot. And defendant claims that it declined to hire Muse because of his dialysis schedule. Def.'s SOF ¶ 13. In addition, Cooper testified in his deposition that Muse was also not hired because he had stated that he had a lifting restriction, Cooper Dep. 165:1–6, and Hodges testified that Muse was not hired because he requested a "light duty" position that was not available. Hodges Dep. 111:17–19, Ex. 8 to Def.'s Mot. It is undisputed that Muse otherwise had sufficient professional qualifications and experience. *See* Cooper Dep. 164:15–19; Hodges Dep. 144:12–16, July 22, 2013, Ex. 8 to Pl.'s Opp. [Dkt. # 15-8].

At some point after defendant declined to hire him, Muse filed a charge with the EEOC alleging violations of the ADA by defendant.[3] Compl. ¶ 7. The EEOC filed its complaint on July 19, 2012 [Dkt. # 1], and defendant filed its answer on September 28, 2012 [Dkt. # 3]. The

---

2    Defendant contends that the EEOC should be bound by its statement in the complaint that during the interview, "Muse was asked by Defendant's Associate Hospital Director for Support Services whether there were any times Muse could not be scheduled for work," and that "Muse replied that he was not available before noon on Mondays, Wednesdays, and Fridays, and that he would prefer evening shifts." Compl. ¶ 11; Def.'s Reply at 1 n.1. But Muse's sworn deposition testimony characterizes his statement differently, and at summary judgment, the Court must consider "the total circumstances of the case," not just the complaint, which was filed by the agency, not Muse himself. *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc).

3    It is not clear from the pleadings or from the record exactly when Muse filed his discrimination charge or what the charge alleged.

parties conducted discovery and, on October 28, 2013, defendant filed the motion for summary judgment [Dkt. # 14] that is now pending before the Court.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways: either by "citing to particular parts of materials in the record, including depositions, documents, . . . [or] affidavits or declarations," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A)–(B).

The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary

judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

The Americans with Disabilities Act makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to . . . hiring." 42 U.S.C. § 12112(a). A "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8). But the ADA does not require employers to hire applicants who are "unable to do the job, even though a handicap lies at the root of that inability." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 29 (1st Cir. 2002); *see also Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 14 (D.D.C. 2000) ("'[H]andicap discrimination laws protect only those who can do their job in spite of their handicap, not those who could do it but for their handicap.'"), quoting *Fields v. Lyng*, 705 F. Supp. 1134, 1136 (D. Md. 1988). Thus, a person is only "qualified" for a position if he can fulfill that position's "essential functions." 42 U.S.C. § 12111(8); *see also Hancock v. Wash. Hosp. Ctr.*, -- F. Supp. 2d --, No. 10-cv-487(RLW), 2014 WL 60288, at *2 (D.D.C. Jan. 7, 2014); *Weigert*, 120 F. Supp. 2d at 14. "Whether an individual is 'qualified' for a job may at times present a pure question of law to be resolved by the court, but it may also . . . be a question of fact that must be resolved by a fact-finder at trial." *Swanks v. Wash. Metro. Area Transit Auth.*, 179 F.3d 929, 934 (D.C. Cir. 1999).

Plaintiff alleges that defendant discriminated against Muse by failing to hire him on the basis of his disability and there is no claim that defendant failed to reasonably accommodate him. *See* Pl.'s Opp. at 11. So, "[p]utting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse

6

employment action (ii) because of the plaintiff's disability." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). In the absence of direct evidence of discrimination, courts in this Circuit apply "the familiar burden-shifting framework" established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001). First, a plaintiff must establish a prima facie case of discrimination by showing that "he ha[s] a disability within the meaning of the ADA, that he [is] 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability." *Swanks*, 179 F.3d at 933–34. Then, the defendant must respond by proffering a "legitimate nondiscriminatory reason" for the allegedly discriminatory action. *Id.* at 933, citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc).

But once a defendant provides its legitimate, non-discriminatory explanation, the "prima-facie-case aspect" of the plaintiff's case becomes "irrelevant." *Adeyemi*, 525 F.3d at 1226; *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). At that point, the only question before the court at the summary judgment stage is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi*, 525 F.3d at 1226, citing *Brady*, 520 F.3d at 493–95. "The plaintiff's 'attack on the employer's explanation must always be assessed in light of the total circumstances of the case.'" *Weigert*, 120 F. Supp. 2d at 6, quoting *Aka*, 156 F.3d at 1291.

In this case, defendant does not challenge plaintiff's assertion that Muse was disabled within the meaning of the ADA or that he was subjected to the adverse employment action of non-selection. *See* 42 U.S.C. § 12102(2)(B) (indicating that an impairment that, like diabetes,

disrupts the functioning of the endocrine system constitutes a disability under the ADA); *see also DuBerry v. District of Columbia*, 582 F. Supp. 2d 27, 36 n.7 (D.D.C. 2008) ("[F]ailure to hire is an adverse employment action."), citing *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). But defendant does offer a legitimate, non-discriminatory explanation for its failure to hire Muse: that Muse's dialysis schedule rendered him unable to "work nights, weekends and holidays and rotating day and evening shifts as assigned," which was an "essential function" of the PSO and PSS positions. Def.'s Reply to Pl.'s Opp. [Dkt. # 16] at 2, 4–5 ("Def.'s Reply"). Therefore, defendant argues, its failure to hire Muse did not constitute discrimination under the ADA. *Id.* at 14.

Thus, the question before the Court is whether plaintiff has "produced sufficient evidence for a reasonable jury to find that [defendant's] non-discriminatory reason was not the actual reason and that [defendant] intentionally discriminated against" Muse "on a prohibited basis." *See Adeyemi*, 525 F.3d at 1226. Plaintiff claims that the following material factual issues are in dispute: (1) whether it was actually an "essential function" of the positions to be able to work rotating shifts; and (2) whether Muse could have fulfilled that "essential function" in any event. Pl.'s Opp. at 7–11.

With respect to the first question, there is legal support for the proposition that the ability to serve on rotating shifts may be an essential function of certain positions, and it is true that defendant included a reference to this requirement in its vacancy announcement. And, while plaintiff has pointed to some inconsistencies in defendant's evidence, it has failed to come forward with evidence of its own that would show that there is a genuine issue of material fact on this point. But the evidence proffered by the defendant is somewhat vague about just what it was that was going to be expected of the employees who would fill these positions, so it is not clear

8

that the Court could find that something was essential as a matter of law when it doesn't quite know what that thing was. In any event, the Court need not predicate judgment for the defendant on such a slender reed because it must deny summary judgment on other grounds: there is a genuine dispute of material fact on the second question. Since plaintiff has come forward with sufficient evidence for a reasonable juror to conclude that Muse could have performed the "essential functions" of the jobs – under any of the varying descriptions of those functions – the Court will deny defendant's motion for summary judgment.

An essential function is a "central position requirement[ ]" that "bear[s] more than a marginal relationship to the job." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 660 (D.D.C. 1997), quoting *Amariglio v. Nat'l R.R. Passenger Corp.*, 941 F. Supp. 173, 178 (D.D.C. 1996) (internal quotation marks omitted).[4] Defendant contends that it was an "essential function" of the DPS positions to be available to work rotating shifts as assigned. And the law is clear that the ability to work a rotating shift can be an essential function. *See, e.g.*, *Kallail v.*

---

4  The EEOC has issued guidance as to what a court should consider when determining "whether a particular function is essential," and the relevant factors include:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)–(vii); *see also Taylor v. Rice*, 451 F.3d 898, 906–07 (D.C. Cir. 2006) (considering these factors).

*Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 931 (8th Cir. 2012) (finding a rotating shift to be essential where the employer contended it allowed it to handle emergencies more effectively and enhanced the non-work life of all employees); *Boitnott v. Corning, Inc.*, No. 7:06-CV-00330, 2010 WL 2465490, at *9 (W.D. Va. June 15, 2010) (finding a rotating shift to be essential where the employer explained it allowed for 24-hour coverage, created consistent work teams, and gave the employer greater flexibility to distribute its workforce).

But it is less clear that defendant has demonstrated the lack of any genuine dispute on the question of whether the ability to rotate was essential. It is undisputed that the vacancy announcements for the DPS positions stated that it was a "minimum requirement" to "be able to work nights, weekends and holidays as well as rotating day and evening shifts as assigned." Ex. 1 to Def.'s Mot. at 2 (PSO position description); Ex. 2 to Def.'s Mot. at 3 (PSS position description). But the other evidence adduced by defendant includes divergent descriptions of what that requirement actually entailed.

Defendant states in its memorandum that "all DPS employees [were] required to be available at any time they were called and . . . shift preferences were not guaranteed." Def.'s Mem. at 3. In its pleadings and through the affidavit of Marvin Cooper, defendant explains that "[a]ll DPS Officer and Supervisor candidates [we]re required to be available to rotate day and evening shifts so that DPS [could] maintain security coverage during anticipated call-outs, vacation time, and shortage[s] of staff," *id.* at 10; *see also* Aff. of Marvin Cooper, Ex. 5 to Def.'s Mot. [Dkt. # 14-7] ¶ 8 ("Cooper Aff."), and "to provide for safety/security operations for the 24-hour business of Howard University Hospital." Def.'s Mem. at 10; Cooper Aff. ¶ 7. Defendant contends that having a workforce that was "available to rotate day and evening shifts" also would enable it "to maintain appropriate levels of skill/expertise/experience in security during

each shift." Def.'s Mem. at 10; *see also* Cooper Aff. ¶ 9. Cooper further explains in his affidavit that "[w]hile DPS allowed candidates . . . to provide [their] shift preferences, no candidate was exempt from rotating day and evening shifts." Cooper Aff. ¶ 12. So, defendant's pleading and Cooper's affidavit indicate that it was an "essential function" of the DPS positions for employees to be highly flexible and available to fill in on any shift, at any time, whenever they were called.

But the testimony of Dr. Hodges paints a somewhat different picture. Hodges was the Associate Director of the hospital at the time Muse applied, and the person with final hiring authority. Cooper Dep. 93:5–7. Hodges explained in her deposition that DPS employees were hired with a "standard shift" assignment, but needed to be available to fill in on other shifts in case of a scheduling emergency or special circumstance. Hodges Dep. 99:22–100:8, Ex. 8 to Def.'s Mot. When asked if applicants had "to be available to work all shifts," Hodges explained that they could not "have a second full-time job . . . because there were occasions where persons who were working shifts other than the ones they were assigned were called in for various reasons." *Id.* 99:16–21. Indeed, in the portion of Hodges's deposition provided by plaintiff, Hodges stated that an applicant was "[a]bsolutely" permitted to request a standard shift, and that expressing a shift preference would "[a]bsolutely not" disqualify an applicant from being hired. Hodges Dep. 99:6–13, Ex. 8 to Pl.'s Opp. Notably, Hodges did not say that it was a job requirement to be available "*at any time*" defendant called. *See* Def.'s Mem. at 3 (emphasis added).

Being available to fill in during other shifts on an ad hoc basis is different from being available to accept a permanent assignment to a rotating schedule, and defendant has not supplied further information about how often these "occasions" occurred. Moreover, Hodges's description of the shift rotation requirement distinguishes this situation from the "essential

11

function" cases cited by defendant, where employees were assigned to fixed rotating schedules. *See Kallail*, 691 F.3d at 927 (explaining that employees "work[ed] in teams of two on nine-week schedules that rotate[d] between twelve-hour and eight-hour shifts, and day and night shifts," and that each week was devoted to different assignments and training exercises); *Boitnott*, 2010 WL 2465490, at *1 (explaining that employees "work[ed] rotating 12-hour shifts with two weeks of days followed by two weeks of nights"). So, although the law supports the idea that the ability to work a rotating shift can be an essential function of a job, the evidence that there was such a requirement in this case is extremely thin.

But in response to a summary judgment motion, the onus shifts to the plaintiff, who has failed come back with any evidence that rebuts the notion that at least some level of scheduling flexibility was "essential." Plaintiff attempts to establish the existence of a genuine issue of material fact by highlighting Hodges's testimony, and it also proffers the employment applications of successful candidates for the DPS positions as well as notes taken by EEOC Investigator James Yao. Plaintiff states that the notes indicate that employees who were hired by defendant had their preferred shifts accommodated, and that defendant did not actually rotate employees through shifts. Pl.'s Opp. at 10–11. But none of this evidence creates a dispute of material fact.

First, plaintiff supplies portions of Dr. Hodges's deposition testimony and contends that they undermine defendant's claim that DPS employees needed "to 'be available at any time they were called.'" Pl.'s Opp. at 10; *see also* Hodges Dep. 101:1–102:22, Ex. 8 to Pl.'s Opp. It is true that Hodges's testimony does not support the notion that employees had to be on call twenty-four hours a day, as defendant's pleading seems to suggest. But all that means is that it is unclear how flexible an employee needed to be, not whether that flexibility was "essential." The

fact that employees were assigned standard shifts and that they were not penalized for being unavailable to work while on vacation is not completely inconsistent with the requirement in the vacancy announcement that employees be *available* to work during other shifts, as assigned, or that this need to be able to provide coverage when called was "essential." *See* Def.'s Mem. at 9; Cooper Aff. ¶ 6. Therefore, Hodges's testimony alone does not demonstrate that there is a genuine issue of material fact in dispute as to whether some availability beyond one's standard shift was "essential."

Plaintiff also offers the employment applications of seven successful candidates and the notes of EEOC Investigator Yao to support its contention that "the work experience of past and present employees . . . contradicts Defendant's claim that a rotating shift schedule is an essential job function of the DPS positions." Pl.'s Opp. at 10. But all the employment applications show is that some successful candidates, like Muse, stated a preference for a particular shift on their employment applications. *See* Ex. 11 to Pl.'s Opp. [Dkt. # 15-11]. This fact is entirely consistent with Cooper's statement that "[w]hile DPS allowed candidates . . . to provide his/her shift preferences, no candidate was exempt from rotating day and evening shifts." Cooper Aff. ¶ 12.

Investigator Yao's notes supposedly memorialize conversations he had with present and former DPS employees who, according to plaintiff, gave Yao information that casts doubt on defendant's contention that it was "essential" for DPS employees to work a rotating shift. Pl.'s Opp. at 10–11; *see also* Ex. 12 to Pl.'s Opp. [Dkt. # 15-12]. But these notes are inadmissible hearsay evidence, which "'cannot be considered on a motion for summary judgment.'" *Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 11 (D.D.C. 2005), quoting *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d

13

1365, 1369 (D.C. Cir. 2000) ("While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence. . . . Otherwise, the objective of summary judgment – to prevent unnecessary trials – would be undermined.").

Yao's notes are classic hearsay: they contain the out-of-court statements of third parties and are offered to prove the truth of the matter they assert. *See* Fed. R. Evid. 801(c). To support the creation of a genuine issue of disputed fact, plaintiff should have deposed, or obtained declarations from, employees with knowledge. And Yao's unsworn, undated notes are also unreliable, since Yao stated in his deposition that he has no recollection at all of his investigation of Muse's case. *See* Dep. of James S. Yao 91:11–17, May 30, 2013, Ex. 1 to Def.'s Reply [Dkt. # 16-1]. Thus, the Court finds that Yao's notes are not capable of being converted into admissible evidence as required by the federal rules. Moreover, even if employees did tell Yao that their preferences were accommodated and they did not formally rotate, it could still have been "essential" to the open positions that an employee be available to cover other shifts on an ad hoc basis.

In sum, defendant has failed to delineate this "essential function" with any specificity, and plaintiff has also failed to demonstrate that a reasonable juror could find that flexibility was not required. But more important, regardless of the degree of flexibility defendant was seeking, it has not been established beyond dispute that Muse could not meet the employer's needs. Plaintiff has provided evidence that would allow a reasonable juror to conclude that Muse could have fulfilled the available-as-needed function, and that defendant's stated reason for failing to hire Muse was therefore a pretext for disability discrimination. For that reason, defendant is not entitled to summary judgment in this case.

Plaintiff's evidence indicates that at the time Muse applied to work for defendant, he could have met defendant's scheduling requirements for the PSS and PSO positions, under any of the definitions defendant has provided for that function. Dr. Hodges explained that defendant planned to give DPS employees a "standard shift," and to assign them to work other shifts on an as-needed basis. *See* Hodges Dep. 99:22–100:19, Ex. 8 to Pl.'s Opp. Plaintiff's evidence shows that before Muse applied to work for defendant, he worked for five years as a security guard for a different facility, Covance Medical Laboratory, under a very similar scheduling arrangement. *See* Muse Dep. 66:1–3; Ex. 3 to Pl.'s Opp. (Muse's resume).

Muse testified in his deposition that Covance security guards worked the same three-shift schedule as defendant's PSS and PSO employees: 7:00 am to 3:00 p.m.; 3:00 p.m. to 11:00 p.m.; and 11:00 p.m. to 7:00 a.m. Muse Dep. 69:12–15. Muse worked a standard shift of 3:00 p.m. to 11:00 p.m. at Covance and, despite his Monday-Wednesday-Friday dialysis schedule, he filled in to cover other shifts "at least once a week, sometimes more than that." *Id.* 74:21–75:7, 77:2–5. Muse stated that he never declined to cover a shift at Covance when he was asked to do so, *id.* 74:2–5, that he was never late for work at Covance, *id.* 107:14–16, and that he never asked for last-minute leave or some other accommodation for his diabetes or dialysis. *Id.* 107:17–108:6. Muse also testified that he was able to change his dialysis appointment time to work around the scheduling needs of his employer, which he planned to do if hired by defendant. *Id.* 94:7–22. And all of this testimony is corroborated by a 2009 performance review from Covance that praised Muse for "volunteering to cover shifts for his teammates who request time off" and for being "very flexible with his schedule this year working on all three shifts, working on days Monday-Sunday as needed, working 40 hours or more in a week contrary to his part time status." Ex. 9 to Pl.'s Opp. [Dkt. # 15-9] at 5. Faced with all of this evidence, a reasonable juror could

15

conclude that Muse could have fulfilled the "essential function" of being available to "work nights, weekends and holidays as well as rotating day and evening shifts as assigned" for defendant.

Defendant contends, without citation to any authority, that the Court should disregard all of this evidence because "[t]he relevant inquiry for purposes of summary judgment is what Mr. Muse told Defendant in the interview process and the basis for Defendant's decision – not what Mr. Muse may or may not have been able to do at times before (or after) the interview process." Def.'s Reply at 3–4; *see also id.* at 13 (reiterating that "*the crux of the Court's inquiry here is what information Mr. Muse provided to Defendant and the basis for Defendant's decision*") (emphasis in original). But as plaintiff points out, defendant's evidence indicates that neither Cooper nor Hodges asked Muse even one question about his dialysis schedule or his ability to work the flexible hours that defendant claims were "essential" to the jobs for which Muse applied.[5] *See* Hodges Dep. 105:20–22, Ex. 8 to Def.'s Mot. ("Q: Did Mr. Cooper question [Muse] at all about his dialysis or request for light duty? A: No."). And although Cooper testified in his deposition that Muse told him that "he could only work the 3:00 to 11:00 or 11:00 to 7:00" shifts, Cooper Dep. 155:18–19, Muse stated in his deposition that he simply informed

---

5     The Court notes that there is some authority that suggests that defendant should have made an "individualized inquiry" into Muse's ability to perform the "essential functions" of the jobs before it decided not to hire him. *See Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) (stating that "'[t]he ADA mandates an individualized inquiry in determining whether an [applicant's] disability . . . disqualifies him from a particular position'"), quoting *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) (first two alterations in original); *Gillen*, 283 F.3d at 29 ("[T]he evidence must show that the employer understood the nature, extent, and implications of the prospective employee's particular impairment, and that the employment decision reflected that understanding."). Moreover the ADA "expressly permits employers 'to make preemployment inquiries into the ability of an applicant to perform job-related functions.'" *Adeyemi*, 525 F.3d at 1229, quoting 42 U.S.C. § 12112(d)(2)(B). Presumably, such an inquiry in this case would have involved asking at least one question about Muse's dialysis requirements, such as whether Muse could be flexible about the time of day in which he received treatment, or whether his appointments could ever be rescheduled to accommodate a shift change.

16

Cooper and Hodges of his dialysis schedule at the time, figuring that he could work out his schedule "pretty easily." Muse Dep. 140:16–141:8.

Muse certainly could have done more to clarify what he claims he was thinking at the time of his interview. But a reasonable juror could find that the evidence that Muse could have fulfilled defendant's "essential functions" rebuts defendant's proffered legitimate nondiscriminatory reason for failing to hire him. *See Aka*, 156 F.3d at 1290 (holding that "a plaintiff's discrediting of an employer's stated reason for its employment decision" can be sufficient "to avoid summary judgment"). Moreover, drawing inferences in favor of the non-moving party, Cooper's and Hodges's failure to ask even one clarifying question about the ability of an otherwise qualified candidate with a disability to fulfill an "essential function" of the DPS positions could lead a reasonable juror to conclude that they decided not to hire Muse based on false assumptions about his disability – which is precisely the type of discrimination that the ADA was enacted to prevent. *See Adams v. Rice*, 531 F.3d 936, 954 (D.C. Cir. 2008) ("Congress enacted the . . . ADA to forbid such blatantly discriminatory actions, intending to protect . . . [those] who qualify as disabled under the statute from employment discrimination based on myths, fears, and stereotypes about the [disability].").[6] And finally, whether Cooper's or Muse's version of what Muse said about his scheduling availability should be believed is plainly the type of credibility determination that belongs to a jury.

---

6   The Court also notes that the inference of discrimination could be further strengthened by the fact that the additional reasons given by Cooper and Hodges for not hiring plaintiff – an alleged lifting restriction, Cooper Dep. 165:1–6, and request for light duty, Hodges Dep. 111:17–19, Ex. 8 to Def.'s Mot. – are directly undermined by the deposition testimony of Muse's physician, Dr. Bivins. Dr. Bivins testified that, when Muse applied to work for defendant in 2009, he did not have a lifting restriction (although "heavy weightlifting" over "150 to 200 pounds" was not recommended), he was "acclimated" to dialysis and could "do whatever he wanted to do" after a treatment, and he was encouraged to get exercise. Bivins Dep. 16:3, 20–21, 17:4–9. Neither party addresses this issue in its pleadings, however, and so the Court does not factor it into its judgment here.

Thus, "in light of the total circumstances of the case," *Aka*, 156 F.3d at 1291, the Court finds that plaintiff's evidence is sufficient to allow a reasonable factfinder to conclude that Muse could have fulfilled the essential functions of the jobs for which he applied, and that defendant discriminatorily failed to hire him on the basis of his disability. Therefore, defendant's motion for summary judgment will be denied.

## CONCLUSION

Because there are genuine issues of material fact in dispute on these issues, the Court will deny defendant's motion for summary judgment. A separate order will issue.

/s/ Amy B. Jackson

AMY BERMAN JACKSON
United States District Judge

DATE: September 30, 2014